## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
## MANHATTAN

| | |
|---|---|
| Belinda Wheeler, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>- against -<br><br>The Topps Company, Inc.,<br><br>Defendant | 1:22-cv-02264<br><br><br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. The Topps Company, Inc. ("Defendant") manufactures, labels, markets, and sells trading cards promising that some packs contain valuable items under the Topps brand (the "Product").

### I. RAPID GROWTH OF TRADING CARD INDUSTRY

2. In the last few years, the trading card market has grown immensely.

3. For example, Michael Jordan's rookie card was valued at $39,600 in January 2020, and within one year, the value had skyrocketed to $720,000.

4. This exponential growth was not limited to individual cards.

5. Almost every company in the trading card market saw surged in value.

6. One auction house that specializes in collectibles saw annual revenues reach $100MM in 2020, with a forecast of $400MM for 2021, from less than a million dollars recently.

7. Consumer demand was so intense that customers waited for hours outside stores in terrible weather, and in some instances fought each other to get the newest cards.

8. Trading card companies saw record profits through this intense surge in demand.

9. These market conditions and higher sales are the reasons Defendant's value reached $1.3 billion in April 2021.

## II. REDEMPTION CARDS LEAD TO INCREASED DEMAND

10. A variety of methods are used to increase consumer demand, but the most successful is the use of redemption cards.

11. A redemption card is a "wildcard" included in each pack that allows its holder, through use of a special code, to obtain a random specialty card.

12. The Product's packaging highlights the redemption cards to induce purchasing.

13. Redemption cards tout their special nature, rarity, value, and the possibility that the item will be autographed by the athlete or entertainer.

14. The value of a redemption card can range from $1.00 to $50,000.00.

15. Redemption cards are promoted across all types of cards Defendant sells, including baseball cards, wrestling cards, automotive cards, and Star Wars cards.

16. However, often the only way to obtain these valuable items is through purchasing the Product.

17. In requiring purchase of the Product and rendering it difficult to impossible for non-purchasers to obtain the redemption cards, consumers are misled to purchase items they otherwise would not have to, at higher prices.

18. Federal and state law require that a contest which offers a chance at winning a thing of value permit any person to enter, regardless of whether they purchased the item in question ("No Purchase Necessary" or "NPN").

19. Where such a contest does not offer non-purchasers the option to enter, it is considered an unlawful lottery, prohibited by federal and state law.

20. NPN instructions are required to be equally prominent to other methods of entry and cannot place a non-purchaser at a disadvantage relative to a purchaser.

A. NPN Instructions Not Available to Non-Purchasers

21. Defendant fails to display the NPN information in a clear and conspicuous manner to non-purchasers.

22. For example, this 2022 Baseball box emphasizes "1 Autograph Or Relic Card."



23. While the fine print on the front states "NO PURCHASE NECESSARY," this is followed by "SEE PACK FOR DETAILS."



24. The back of the box provides no information concerning the NPN instructions.

3



25. The result is that potential entrants to the contest are required to purchase the Product to obtain the NPN instructions on the back of the packs.

 

4

26. Someone who wishes to enter the contest could not purchase the Product, obtain the NPN instructions from the pack, and then return the Product, because returns for previously opened trading card merchandise is not allowed by merchants.

B. NPN Term are Onerous and Unfair to Non-Purchasers

27. Where the Product prints NPN instructions on the box, the requirements and conditions render it onerous, oppressive, improbable, and impossible, for non-purchasers to have an equal chance at winning the contest.

28. For example, many deadlines to submit entries will occur weeks and months prior to the Product's release date.

29. The result is that the only way to enter the contest is by purchasing the Product.

30. For example, the 2021 Bowman Platinum Baseball Cards were released on October 15, 2021.



31. However, the deadline for NPN entries to be postmarked was September 12, 2021 and received by September 19, 2021.

32. This provides an advantage to persons who purchase the Product over those who do not purchase it but still wish to enter.

### III. CONCLUSION

33. Defendant makes other representations and omissions with respect to the Product and contest which are unlawful, false or misleading.

34. Consumers erroneously believe their only way to obtain the valuable redemption cards is through purchasing the Product.

35. The result is consumers purchase more of the Products, at higher prices, than they otherwise would have, to have a greater chance at obtaining the valuable redemption cards.

36. Reasonable consumers must and do rely on a company to honestly identify, market, and describe the components, attributes, and features of a product and contest, relative to itself and other comparable products or alternatives.

37. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

38. This is because Plaintiff did not have to purchase the Products to enter the contests, but due to the practices described here, was not given another reasonable option.

39. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

40. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

41. As a result of the false and misleading representations, the Product is sold at a

premium price, approximately no less than no less than $20 per box and $8 per pack, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

42. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

43. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

44. Plaintiff Belinda Wheeler is a citizen of District of Columbia.

45. Defendant The Topps Company, Inc. is a Delaware corporation with a principal place of business in New York, New York County, New York.

46. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

47. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

48. The Product is available to consumers from third-party retail stores, big box stores, department stores, hobbyist or card stores, and Defendant's website

49. Venue is in Manhattan in this District because a substantial part of the events or omissions giving rise to these claims occurred in New York County, i.e., Defendant's decisions for labeling the Product and designing the contest rules and conditions.

## Parties

50. Plaintiff Belinda Wheeler is a citizen of Washington, District of Columbia (County),

District of Columbia.

51. Defendant The Topps Company, Inc. is a Delaware corporation with a principal place of business in New York, New York, New York County.

52. Topps is the oldest brand of trading cards in the United States.

53. Numerous generations of Americans grew up with the Topps brand.

54. Topps not only sells baseball cards, but cards across numerous areas, such as entertainment, movies, and other subjects of interest to consumers.

55. Because Americans grew up with Topps, they trust it implicitly to be fair with them, especially when it comes to a contest.

56. The Product is available to consumers from third-party retail stores, big box stores, department stores, hobbyist or card stores, and Defendant's website

57. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Walmart, Target, Defendant's website, and card stores, at locations including within the Washington Metropolitan Area and elsewhere on the East Coast between 2021 and 2022, and/or among other times.

58. Plaintiff believed the Product was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

59. Plaintiff bought the Product because she expected it was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing because that is what the representations and omissions said and implied.

60. Plaintiff relied on the words, terms coloring, descriptions, layout, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, and/or claims made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product

8

and separately, through in-store, digital, audio, and print marketing.

61. Plaintiff was disappointed because she believed the Product was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

62. Plaintiff bought the Product at or exceeding the above-referenced price.

63. Plaintiff would not have purchased the Product if she knew the representations and omissions were false, unlawful, and misleading or would have paid less for it.

64. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

65. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false, unlawful, and misleading statements and omissions.

66. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations about the contests are fair and lawful, consistent with their abilities, attributes, and/or composition.

67. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar trading cards offering chances to win valuable items, because she is unsure whether those representations are truthful.

## Class Allegations

68. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **District of Columbia Class:** All persons in the State or federal district of District of Columbia who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of New York, Arkansas, Iowa, Utah, and Montana who purchased the Product during the statutes of limitations for each cause of action

alleged.

69. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading, unfair, and unlawful, and if Plaintiff and class members are entitled to damages.

70. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, unlawful, and deceptive representations and actions.

71. Plaintiff is an adequate representative because her interests do not conflict with other members.

72. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

73. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

74. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

75. Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350

(Consumer Protection Statute)

76. Plaintiff incorporates by reference all preceding paragraphs.

77. Plaintiff believed Defendant's marketing was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

78. Defendant's false, unlawful, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

79. Defendant misrepresented the Product through statements, omissions, ambiguities,

half-truths and/or actions.

80. Plaintiff relied on the representations that the Product was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

81. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

82. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

83. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

84. Defendant intended that each of the members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

85. As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

86. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

87. The Product was manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

88. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

89. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

90. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

91. Defendant's representations affirmed and promised that the Product was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

92. Defendant described the Product as one which was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

93. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

94. This duty is based on Defendant's outsized role in the market for this type of Product,

12

the oldest brand of trading cards in the country and a staple of Americana.

95. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

96. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

97. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

98. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

99. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

100. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

101. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

102. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

103. Defendant had a duty to truthfully represent the Product, which it breached.

104. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the oldest brand of trading cards in the country and a staple of Americana.

105. Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

106. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

107. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

108. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

109. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

110. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was not an unlawful lottery and that purchasing the Product provided a greater chance at winning the contests than not purchasing.

111. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of

14

the falsity, unlawfulness, or deception, through statement and omission, of the representations.

112. Defendant knew of the issues described here yet did not address them.

113. Defendant's fraudulent intent is evinced by its knowledge that the Product and contest was not consistent with its representations.

## Unjust Enrichment

114. Defendant obtained benefits and monies because the Product and contest was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   March 18, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com

Steffan T. Keeton*
The Keeton Firm LLC
100 S Commons Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

Scott C. Borison*
Borison Law Firm
1900 S Norfolk St Ste 350
San Mateo CA 94403
scott@borisonfirm.com
Tel: (301) 620-1016

*Pro Hac Vice forthcoming