**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN COURTHOUSE**

| | |
|---|---|
| Belinda Wheeler, individually and on behalf of all others similarly situated, | 1:22-cv-02264-LGS |
| Plaintiff, | |
| - against - | First Amended Class Action Complaint |
| The Topps Company, Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.    The Topps Company, Inc. ("Defendant") manufactures, labels, markets, and sells trading cards offering entry into "No Purchase Necessary" ("NPN") contests under the Topps brand (the "Product").

**I.    RAPID GROWTH OF TRADING CARD INDUSTRY**

2.    In the last few years, the trading card market has grown immensely.

3.    For example, Michael Jordan's rookie card was valued at $39,600 in January 2020, and within one year, the value had skyrocketed to $720,000.

4.    This exponential growth was not limited to individual cards.

5.    Almost every company in the trading card market saw a surge in value.

6.    One auction house that specializes in collectibles saw annual revenues from less than a million dollars soar to $100MM in 2020, with a forecast of $400MM for 2021.

7.    Consumer demand was so intense that customers waited for hours outside stores in terrible weather, and in some instances fought each other to get the newest cards.

8.      These market conditions and higher sales are the reasons Defendant's value reached $1.3 billion in April 2021.

## II.    HIGH VALUE CARDS LEAD TO INCREASED DEMAND

9.      A variety of methods are used to increase consumer demand, but the most successful is the use of NPN promotions.

10.      The NPN contests are a way for consumers to submit an entry to obtain the chance to win a randomly selected card without having to purchase the expensive card packs.

### A.    Failure to Disclose Alternate Methods of Entry Renders NPN Contests Unlawful Lotteries

11.      A lottery is defined as an unlawful gambling scheme in which the players pay or agree to pay something of value for chances to win something of value based on chance.

12.      By failing to conspicuously and prominently disclosing an alternative method of entry ("AMOE") to non-purchasers, Defendant's NPN contests are equivalent to an unlawful lottery. N.Y. Pen. Law § 225.00(10).

13.      For example, Defendant's 2022 Baseball Series entices purchasers to "Look for 1 Autograph Or Relic Card.*"



14.    The fine print on the front of the box states "NO PURCHASE NECESSARY. SEE

PACK FOR DETAILS."



15.    Nowhere on the outside of the Product, such as the back, shown below, are

instructions provided to participate in the NPN contest.



16.    The result is that potential entrants to the NPN contest are required to purchase the

Product to obtain the NPN instructions on the back of the individual packs sealed inside the box.

 

17.    Nor could someone who wishes to enter this, or other of Defendant's NPN contests, could not purchase the Product, obtain the NPN instructions from the pack inside the sealed box, and then return the Product, because returns for previously opened trading card merchandise is not allowed by merchants.

18.    Failure to provide an alternative method of entry converts Defendant's NPN promotions into unlawful lotteries, in violation of N.Y. Penal Law § 225.00.

B.  NPN Term are Onerous and Unfair

19.    Where the Products print NPN instructions on the box, the requirements and conditions render it onerous, oppressive, improbable, and/or impossible, for consumers to have a chance at winning the contest.

20.    This is because the deadlines to submit entries to the NPN contests are prior to the release date of such Products, making it impossible for purchasers to enter.

21.    For example, the 2021 Bowman Platinum Baseball Cards were released on October 15, 2021.



22.    However, the deadline for NPN entries to be postmarked was September 12, 2021 and received by September 19, 2021.

23.    For many of Defendant's NPN contests, it does not publicly disclose information regarding them, including their completion, the winners, and the dates they received the prizes.

24.    This prevents potential purchasers from verifying that the NPN contests were completed and that cards were disseminated to winners in a timely manner.

25.    Defendant fails to ensure that in all retail establishments where its Products with NPN contests are sold, there are also prominent and conspicuous notices regarding the  minimum number  and  value of prizes available to be won over the stated period of its NPN contests, and the rules and regulations for its NPN contests. GBL § 369-e(2).

26.    Defendant makes other representations and omissions with respect to the Products and NPN contests which are unlawful, false or misleading.

27.    The result is that consumers may purchase more of the Products, at higher prices,

than they otherwise would have, to obtain entry into the NPN contests.

28.    Reasonable consumers must and do rely on a company to honestly identify, market, and describe the components, attributes, and features of its products and contests, relative to itself, other comparable products or alternatives, and consistent with the legal requirements

29.    The value of the Products that Plaintiff purchased was materially less than their value as represented by Defendant, because the NPN contests were not represented truthfully and, in the manner, required by law.

30.    This is because Plaintiff and consumers did not have to purchase the Products to enter the NPN contests, but due to the practices described here, was not given another reasonable option.

31.    Defendant sold more of the Products and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

32.    Had Plaintiff and proposed class members known the truth, they would not have bought the Products or would have paid less for them.

33.    As a result of the false and misleading representations, the Products are sold at a premium price, approximately no less than no less than $20 per box and $8 per pack, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

34.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

35.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

36.    Plaintiff Belinda Wheeler is a citizen of District of Columbia.

37.    Defendant The Topps Company, Inc. is a Delaware corporation with a principal place of business in New York, New York County, New York.

38.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

39.    The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

40.    The Products are available to consumers from third-party retail stores, big box stores, department stores, hobbyist or card stores, and Defendant's website

41.    Venue is in Manhattan in this District because a substantial part of the events or omissions giving rise to these claims occurred in New York County, i.e., Defendant's decisions for labeling the Product and designing the contest rules and conditions.

Parties

42.    Plaintiff Belinda Wheeler is a citizen of Washington, District of Columbia (County), District of Columbia.

43.    Defendant The Topps Company, Inc. is a Delaware corporation with a principal place of business in New York, New York, New York County.

44.    Topps is the oldest brand of trading cards in the United States.

45.    Numerous generations of Americans grew up with the Topps brand.

46.    Topps not only sells sports cards, but cards across numerous areas, such as entertainment, movies, and other subjects of interest to consumers.

47.    Because Americans grew up with Topps, they trust it implicitly to be fair with them, especially when it comes to a contest.

48.    The Products are available to consumers from third-party retail stores, big box stores, department stores, hobbyist or card stores, and online, from Defendant's website and those of third-parties.

49.    Plaintiff purchased the Products on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Walmart, Target, Defendant's website, and card stores, at locations including within the Washington Metropolitan Area and elsewhere on the East Coast between 2021 and 2022, and/or among other times.

50.    Plaintiff bought the Products because she expected this would provide her a greater chance to win the NPN contest.

51.    Plaintiff was not presented with the instructions for an alternative method of entry without first purchasing the Product.

52.    The result was that Plaintiff purchased products she otherwise would not have in order to enter the NPN contests.

53.    Plaintiff relied on the words, terms coloring, descriptions, layout, packaging, tags, and/or images on the Products and its inconspicuous disclosures regarding the NPN contests, and its omissions of alternative methods of entry, on the labeling, statements, omissions, and/or claims made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Products and separately, through in-store, digital, audio, and print marketing.

54.    Plaintiff often bought the Products at or exceeding the above-referenced prices due to the rarity of the NPN prizes.

55.    Plaintiff was not presented with the required retail disclosures regarding the NPN contests.

56.    Plaintiff would not have purchased the Products if she knew the representations about

the NPN contests were false, unlawful, and misleading or would have paid less for them.

57.    Plaintiff chose between Defendant's Products and products represented similarly, but which did not misrepresent their NPN contests.

58.    The Products were worth less than what Plaintiff paid because it failed to truthfully disclose alternative methods of entry to the NPN contests and she would not have paid as much absent Defendant's false, unlawful, and misleading statements and omissions.

Class Allegations

59.    Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following Class:

60.    All persons in the District of Columbia, New York,  Arkansas, Iowa, Utah, and Montana who purchased the Products during the statutes of limitations for each cause of action alleged.

61.    Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading, unfair, and unlawful, and if Plaintiff and class members are entitled to damages.

62.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, unlawful, and deceptive representations and actions.

63.    Plaintiff is an adequate representative because her interests do not conflict with other members.

64.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

65.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

66.    Plaintiff's counsel is competent and experienced in complex class action litigation

and intends to protect class members' interests adequately and fairly.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

67.   Plaintiff incorporates by reference all preceding paragraphs.

68.   The classes Plaintiff seeks to represent assert causes of action under GBL §§ 349 &

350, because Defendant is a New York corporation.

69.   Plaintiff believed she had to purchase the Products to enter the NPN contests, because

she was not sufficiently informed of alternative methods of entry.

70.   Plaintiff believed that purchasing the Products would provide her with a greater

chance at success in Defendant's NPN contests.

71.   Plaintiff believed when she purchased the Products, she would be able to participate

in the identified NPN contests, which she, and the public, were unable to do, because the dates of

the NPN contests had already passed at the time of certain products' release to the public.

72.   Defendant's false, unlawful, and deceptive representations and omissions about the

Products and its NPN contests are material in that they are likely to influence consumer purchasing

decisions.

73.   Defendant misrepresented the Products and NPN contest information through

statements, omissions, ambiguities, half-truths and/or actions.

74.   Plaintiff relied on the representations and omissions with respect to the failure to

prominently and conspicuously disclose alternative methods of entry to purchase more of the

Products.

75.    Plaintiff and class members would not have purchased the Products or paid as much

if the true facts had been known, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

76.    The Products and NPN contests were designed, implemented, manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that purchasing the Products was the only way to learn of the alternative methods of entry to the NPN contests, and that purchasing the Products would permit them to enter the NPN contests.

77.    Defendant directly marketed the Products and NPN contests to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

78.    Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as the opportunity to win valuable cards, without having to purchase the expensive Products, and developed its marketing and labeling to directly meet those needs and desires.

79.    Defendant's representations about the  Products and NPN contests were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it complied with legal requirements, and that her purchases gave her a greater chance to win the valuable cards, and that at a minimum, the dates for participating in the NPN contests would not have passed when the Products were released to the public.

80.    Defendant's representations affirmed and promised that purchasing the Products was necessary or beneficial to gain entry to the NPN contests.

11

81.    Defendant marketed and described the Products and NPN contests as complying with all legal requirements, and that purchasing the Products was often the only way to obtain NPN contest information, which became part of the basis of the bargain that the Products would conform to their affirmations and promises.

82.    Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products and NPN Contests.

83.    This duty is based on Defendant's outsized role in the market for trading cards, the oldest brand in the country and a staple of Americana.

84.    Plaintiff recently became aware of Defendant's breach of the Products' warranties.

85.    Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

86.    Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Products and its NPN contests.

87.    Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

88.    The Products and NPN contests did not conform to their affirmations of fact and promises due to Defendant's actions.

89.    The Products were not merchantable because they were not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if a purchaser needed to buy the Products in order to enter the NPN contests, and if they bought more Products, would have a greater chance of success, when this is false

90.    The Products were not merchantable because they were not sold lawfully, and Plaintiff would otherwise not have purchased a product that did not conform to legal requirements.

91.    The Products were not merchantable because Defendant had reason to know a particular purpose for which the Products were bought by Plaintiff, to gain entry into the NPN contests, even though it knew such purchase was not required, because Defendant failed to prominently and conspicuously disclose alternative methods of entry, and that it knew the dates for certain NPN contests had already passed when certain Products were released to the public.

92.    Plaintiff relied on Defendant's skill and judgment to select or furnish such suitable products and design and management of NPN contests.

93.    Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

94.    Defendant had a duty to truthfully represent the Product, which it breached.

95.    This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the oldest brand of trading cards in the country and a staple of Americana.

96.    Defendant's representations regarding the Products and NPN contests went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, honesty, fairness, transparency and putting customers first, that it has been known for.

97.    These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

98.    The representations took advantage of consumers' cognitive shortcuts made at the

point-of-sale and their trust in Defendant.

99.    Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Products, to enable them to have a greater chance at winning the NPN contests.

100.    Plaintiff and class members would not have purchased the Products, or as many of them, or paid as much for them, if the true facts of the NPN contests had been known, suffering damages.

### Fraud

101.    Defendant misrepresented and/or omitted the attributes and qualities of the Products by not disclosing alternative methods of entry to the NPN contests, in a way that would have informed Plaintiff and/or the public that it was not necessary to buy the Products to increase their chances of winning.

102.    Defendant misrepresented the Products by including NPN contests where the dates for participation had already passed at the time the Products were released to the public.

103.    Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity, unlawfulness, or deception, through statement and omission, of the representations.

104.    Defendant knew of the issues described here yet did not address them.

105.    Defendant's fraudulent intent is evinced by its knowledge that the Products and NPN contests were not consistent with its representations and contrary to law.

### Unjust Enrichment

106.    Defendant obtained benefits and monies because the Product and NPN contests were not fair, nor represented truthfully and in compliance with what the law required, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of

inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.  Injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.  Restitution and disgorgement for members of the class pursuant to the applicable laws;

4.  Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   May 10, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com

Steffan T. Keeton*
The Keeton Firm LLC
100 S Commons Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

Scott C. Borison*
Borison Law Firm
1900 S Norfolk St Ste 350
San Mateo CA 94403
scott@borisonfirm.com
Tel: (301) 620-1016

*Pro Hac Vice forthcoming